IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| AMAL B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21cv1202 (RDA/JFA) |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 15, 18). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 12). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

# I. PROCEDURAL BACKGROUND

In June 2018, plaintiff applied for DIB and SSI alleging a disability onset date of November 6, 2017. (AR 227–28, 230–35). The Social Security Administration ("SSA") denied plaintiff's application for DIB on October 29, 2018. (AR 127–37). On November 10, 2018, plaintiff appointed Andrew Mathis to represent her with respect to her claims. (AR 139, 141). Plaintiff requested reconsideration of her DIB denial on November 20, 2018. (AR 142, 144). The SSA denied plaintiff's application for SSI on December 24, 2018 (AR 145–55), and it affirmed its denials of plaintiff's applications for DIB and SSI on April 22, 2019 (AR 156–69). Plaintiff requested a hearing before an ALJ (AR 170–75), which the Office of Hearings Operations scheduled for March 31, 2020 (AR 186–91, 193–98). Plaintiff's disability hearing was rescheduled multiple times due to the ongoing COVID-19 pandemic and scheduling issues. (AR 53–62, 217–20).

On March 15, 2021, ALJ Michael A. Krasnow held a telephone hearing on plaintiff's disability claims. (AR 31–52). Plaintiff appeared through a translator with Mr. Mathis as her representative. (AR 31–34, 342). Plaintiff provided testimony and answered questions posed by the ALJ and her representative. (AR 36–45). A vocational expert also answered questions from the ALJ and plaintiff's representative. (AR 45–49).

On March 25, 2021, the ALJ issued a decision finding that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (AR 12–25). On April 8, 2021, plaintiff sent a request for review of the ALJ's decision to the Appeals Council. (AR 222–23, 344–46). On September 2, 2021, the Appeals Council denied plaintiff's request for review, finding no reason under its rules to review the ALJ's decision. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1); *see* 20 C.F.R.

2

§§ 404.981, 416.1481.  Plaintiff was given sixty (60) days to file a civil action challenging the decision.  (AR 2); *see* 20 C.F.R. §§ 404.981, 416.1481.

On October 29, 2021, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  (Docket no. 1).  On January 28, 2022, the court set a briefing schedule for the parties' cross-motions for summary judgment. (Docket no. 14).  Plaintiff filed her motion for summary judgment on February 10, 2022. (Docket no. 15).  The Commissioner filed her cross-motion for summary judgment on March 3, 2022.  (Docket no. 18).  Plaintiff filed a reply on March 17, 2022.  (Docket no. 22).  The case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment.  (Docket nos. 15, 18).

## II. STANDARD OF REVIEW

Under the Social Security Act, the district court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence."  *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Id.* (internal quotations and citations omitted).  In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary."  *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  It is the ALJ's duty, and not that of the reviewing court, to resolve evidentiary conflicts,

3

and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## III.  FACTUAL BACKGROUND

### A.   Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1960 and was fifty-six (56) years old at the time of the alleged onset of disability.  (AR 227).  Plaintiff attended college.  (AR 37, 256).  Plaintiff worked in food preparation for a Whole Foods supermarket from 2006 until 2017.  (AR 37, 256).

### B.   Overview of Plaintiff's Medical History and Treatment[2]

A brief overview of plaintiff's medical history and a short summary of her treatment is provided to give a framework for the more detailed discussion of plaintiff's medical issues and claims that follows.  Plaintiff's medical history includes diagnoses of syncope, post-concussion syndrome, bilateral sensorineural hearing loss, disequilibrium, vertigo, and chronic dizziness. (AR 354, 361, 392, 402, 432).

*i. Plaintiff's November 2017 Syncopal Episode and Follow-Up*

On November 6, 2017, plaintiff presented at the Alexandria Hospital Emergency Department following a fainting episode that occurred while she was standing at her workstation two hours earlier.  (AR 361–62).  Plaintiff indicated that she fell and hit her face on the ground and was out for a few seconds, but she denied experiencing dizziness before her loss of consciousness.  (AR 361–62).  Plaintiff reported pain around her eye and face where she hit the ground, but she denied visual changes, vomiting, diarrhea, numbness, weakness, dental

---

[2] The AR contains nearly 100 pages of medical records from various sources relating to plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every medical treatment.

problems, chest pain, or shortness of breath. (AR 361–62). Plaintiff reported past dizziness, which she indicated was not as severe, and her husband stated that she was seen for dizziness three months earlier but that her bloodwork was normal. (AR 361). Plaintiff's review of systems was positive for facial bruising, and a facial CT showed soft tissue swelling on her left side without evidence of a fracture. (AR 362–65). A head CT showed no evidence of acute intracranial abnormality, and plaintiff reported improvement with her symptoms. (AR 365–66). Plaintiff declined hospitalization for evaluation of syncope, and she indicated that she would follow up with outpatient neurology and cardiology. (AR 366).

Plaintiff returned to the Emergency Department on November 11, 2017 and reported improving periorbital facial pain following her prior syncopal episode but her husband reported that she was sleeping all day and could not return to work. (AR 359). Plaintiff also complained of left shoulder pain and headaches, but she denied chest pain, dizziness, or other symptoms. (AR 359). Plaintiff denied pain medication but requested additional time off work, which was ordered. (AR 360). Plaintiff was diagnosed with post-concussion syndrome and discharged with prescriptions for cyclobenzaprine and ibuprofen. (AR 359–61).

On November 21, 2017, plaintiff saw Dr. Rajesh Sethi for a neurological follow-up on her prior syncopal episode. (AR 352–54). Plaintiff reported that she had been standing at work when she felt faint, lightheaded, and dizzy and passed out briefly. (AR 352). Plaintiff was awakened in her manager's office and became aware of her surroundings soon after regaining consciousness. (AR 352). Plaintiff's syncopal episode occurred without convulsive limb jerking, tongue biting, or incontinence, and she was transported to the Emergency Department by ambulance and released after evaluation. (AR 352). Plaintiff reported three to four months of prior lightheadedness and dizziness that resulted in falls or passing out, but she indicated that she

had been able to hold onto something and sit down for a minute or so until the episodes passed.

(AR 352). Plaintiff denied palpitations, chest pain, ongoing headaches, memory problems, or

focal motor or sensory limb deficits. (AR 352). Dr. Sethi noted plaintiff's history of hearing

loss and use of hearing aids. (AR 352). A review of systems was negative aside from plaintiff's

neurological complaints. (AR 353). A physical examination was notable for tenderness of the

left forehead and Malar region of the left cheek and reduced hearing, but it was otherwise

normal. (AR 353–54). Dr. Sethi diagnosed plaintiff with likely vasovagal syncope and

recommended a cardiology consultation, EEG, and brainstem auditory evoked response

("BAER") test. (AR 354). Plaintiff underwent the EEG and BAER test on December 2, 2017,

and the results for both were normal. (AR 355–56).

On December 5, 2017, plaintiff saw Dr. Sethi for neurological follow-up on her syncope.

(AR 348–51). Plaintiff reported a brief syncopal episode on December 1, 2017 while sitting and

watching television at home with her husband. (AR 348). Plaintiff indicated that she had not

followed up with a cardiology consultation as recommended because it was not authorized by

workers' compensation, but she had regular insurance. (AR 348). Plaintiff reported mild

residual soreness at her left forehead contusion. (AR 348). Plaintiff's review of systems was

again negative aside from her neurological complaints. (AR 349). A physical examination was

normal aside from tenderness at plaintiff's left forehead and reduced hearing. (AR 349–50). Dr.

Sethi cleared plaintiff to return to work from a neurological standpoint but recommended that she

undergo a cardiac evaluation. (AR 350).

### ii. Plaintiff's ENT Treatment (2018–2020)

On May 3, 2018, plaintiff saw Dr. M. Tarek Orfaly at Metropolitan ENT for a hearing

loss evaluation. (AR 391–93). Plaintiff reported bilateral hearing loss, which she described as

6

distorted, moderate, and ongoing for twenty years. (AR 391). Plaintiff indicated that she noticed

some hearing loss after giving birth in 2002, and she stated that a recent hearing test showed 92%

loss on her left side. (AR 392). Plaintiff reported associated dizziness and tinnitus, and she wore

a hearing aid in her left ear. (AR 391). An examination was notable for right tympanosclerosis,

left dull, but was otherwise normal. (AR 391–92). Dr. Orfaly noted that plaintiff demonstrated a

normal ability to communicate with conversational speech and that she rarely or never

misunderstood words. (AR 391). A tympanogram showed low-compliance, left ear; results

within normal limits, right ear; severe rising to moderate sensorineural hearing loss ("SNHL")

with an air-bone gap at 1000 Hz, right ear; and severe rising to mild SNHL, left ear. (AR 392–

93). Plaintiff was diagnosed with SNHL, bilateral, and Dr. Orfaly recommended that she

continue use of hearing aids and consider cochlear implants if her hearing diminished further.

(AR 392).

On May 9, 2018, plaintiff saw Dr. Orfaly for follow-up on her hearing loss and a

videonystagmography ("VNG"). (AR 401–02). Plaintiff reported unchanged hearing loss with

continued dizziness and tinnitus, and an examination was again normal aside from right

tympanosclerosis, left dull. (AR 401–02). Dr. Orfaly again noted that plaintiff demonstrated a

normal ability to communicate with conversational speech and that she rarely or never

misunderstood words. (AR 401). The VNG results were abnormal and showed no gaze

nystagmus. (AR 394, 402). The VNG was notable for abnormal visual pursuit and upbeating

nystagmus in all positions. (AR 394). Dr. Orfaly diagnosed plaintiff with disequilibrium and

vertigo along with SNHL. (AR 402).

On November 6, 2018, plaintiff saw Dr. Orfaly for follow-up on her hearing loss. (AR

410–12). Plaintiff reported unchanged hearing loss with continued dizziness and tinnitus. (AR

410).  Plaintiff indicated that she received new hearing aids roughly two months earlier, and she reported mild improvement with her hearing.  (AR 411).  Plaintiff's husband stated that she did not turn the volume up on the television as high when she used her hearing aids.  (AR 411).  An examination was notable for right and left scarred tympanic membranes and right tympanosclerosis, but it was otherwise normal.  (AR 410–11).  Consistent with his prior findings, Dr. Orfaly found that plaintiff demonstrated a normal ability to communicate with conversational speech and that she rarely or never misunderstood words.  (AR 410–11).  Aided bilateral soundfield testing revealed moderate to severe hearing loss.  (AR 411, 414).  Dr. Orfaly believed that plaintiff's continued difficulty hearing with use of hearing aids was caused by the type of hearing aid that she was wearing.  (AR 411).

On November 12, 2018, Dr. Orfaly wrote a letter in support of plaintiff's disability claim. (AR 409).  Dr. Orfaly stated that plaintiff was unable to communicate or perform her job duties at that time, especially without hearing aids.  (AR 409).  Dr. Orfaly recommended that plaintiff be considered for disability due to her level of hearing loss and its impact on her ability to perform her work duties.  (AR 409).

On March 5, 2019, plaintiff saw Dr. Orfaly for follow-up on her hearing loss.  (AR 419–20).  Plaintiff reported worsened hearing loss with improved dizziness and continued tinnitus. (AR 419).  Plaintiff also reported mild left otalgia and feedback on her right side.  (AR 419–20). Plaintiff indicated that she had to listen to the television at a higher volume to hear with her hearing aids.  (AR 419).  The results of an examination were unchanged, and Dr. Orfaly continued to note plaintiff's normal ability to communicate with conversational speech.  (AR 419–20).  Dr. Orfaly indicated that there was no cerumen or blockage that would have caused the hearing aids not to work as well, and he recommended that plaintiff follow up with the hearing

8

aid provider for troubleshooting. (AR 420). Plaintiff agreed to follow up with an audiologist for a hearing aid consultation if there was no improvement. (AR 420).

On May 7, 2019, plaintiff reported unchanged hearing loss with intermittent but mostly improved dizziness and otalgia and continued tinnitus. (AR 428–29). Plaintiff indicated that her hearing aids had new batteries and were well-cleaned, but she noted no improvement. (AR 429). Plaintiff stated that she often raised the volume on the television. (AR 429). The results of an examination were unchanged, as were Dr. Orfaly's observations about plaintiff's normal ability to communicate with conversational speech. (AR 428–29). Dr. Orfaly confirmed that plaintiff's ears were clear bilaterally and without cerumen obstruction, and he noted that plaintiff had an audiologist consultation for hearing aids scheduled in June. (AR 429).

On July 2, 2019, plaintiff reported worsened hearing loss with resolved dizziness, otalgia, and tinnitus. (AR 425). Plaintiff's husband indicated that her hearing was getting worse, and he reported that she wore old hearing aids and needed to turn up the volume on the television and ask other people to repeat themselves. (AR 426). Dr. Orfaly noted, however, that plaintiff continued to demonstrate a normal ability to communicate with conversational speech and that she rarely or never misunderstood words. (AR 425–26). Dr. Orfaly also noted that plaintiff had "concern" regarding her hearing aid consultation. (AR 425).

On January 7, 2020, plaintiff reported worsened hearing loss with dizziness and ringing. (AR 422). Plaintiff reported bilateral ringing and two dizzy episodes the prior day while sitting down, which lasted five minutes. (AR 422). Plaintiff stated that her dizziness restricted her from doing her normal activities. (AR 423). Consistent with prior examinations, Dr. Orfaly found right and left scarred tympanic membranes and right tympanosclerosis. (AR 422–23). As with each of plaintiff's prior appointments, Dr. Orfaly determined that she demonstrated a

9

normal ability to communicate with conversational speech and that she rarely or never misunderstood words. (AR 422–23). An updated tympanogram showed reduced compliance, left ear; results within normal limits, right ear; moderately severe sloping to severe rising to moderately severe SNHL with a masking dilemma at 1000 Hz, right ear; and moderately severe rising to moderate SNHL with a masking dilemma at 500 and 1000 Hz, left ear. (AR 423, 431).

On January 10, 2020, Dr. Orfaly completed a medical source statement for plaintiff's disability claim. (AR 432–35). Dr. Orfaly noted plaintiff's prior diagnoses of severe bilateral hearing loss and chronic dizziness, which he found unlikely to improve. (AR 432). Dr. Orfaly determined that plaintiff could sit, stand, and walk for less than two hours in an eight-hour workday with normal breaks. (AR 432). He separately concluded that plaintiff could sit for two to three hours. (AR 433). Dr. Orfaly noted that plaintiff did not require an ambulatory aid but found that her impairments prevented her from standing and/or sitting upright for six out of eight hours in a workday. (AR 433). Dr. Orfaly found that plaintiff's recurrent feelings of imbalance and dizziness required that she lie down during the day, that her difficulty walking long distances prevented her from traveling alone, and that plaintiff was incapable of even low-stress jobs. (AR 433). Dr. Orfaly found that plaintiff could frequently reach, handle, finger, feel, and push or pull controls with both upper extremities, and that she could frequently lift and carry only less than five pounds and occasionally carry only five to ten pounds. (AR 434). Dr. Orfaly determined that plaintiff could occasionally stoop, bend, squat, kneel, and turn her head, and he concluded that her disability was unlikely to change and that it would cause her to be absent from work more than three times per month. (AR 434–35). Dr. Orfaly expected that plaintiff would require additional rest periods of a variable amount and duration beyond those normally allowed during

a work shift, and he noted that plaintiff had very poor hearing even when using hearing aids. (AR 435).

### iii. State Agency Assessments

On October 29, 2018, plaintiff's claim for DIB was evaluated by a state agency physician at the initial level. (AR 78–86). Dr. Nicolas Tulou noted that plaintiff lived with family and fixed simple meals but did not do household chores or yardwork. (AR 81). Dr. Tulou considered plaintiff's reports that she risked getting dizzy and did not like to be alone and that she shopped with her husband and handled her own money. (AR 81). Dr. Tulou further considered plaintiff's statements that she was unable to lift more than five pounds or stand more than twenty minutes, that she had completely lost her hearing, and that she wore hearing aids. (AR 81). Dr. Tulou determined that plaintiff's hearing loss was a severe medically determinable impairment. (AR 81). Dr. Tulou found that plaintiff's symptom-imposed limitations were partially credible but that the severity of the symptoms and the alleged effects on plaintiff's functional abilities were not entirely consistent with the total medical and non-medical evidence, including statements by plaintiff and others, observations regarding plaintiff's activities of daily living ("ADLs"), and alterations of usual behavior or habits. (AR 82). Dr. Tulou found that plaintiff had no exertional limitations, but found she had the following postural limitations: that she could frequently balance, occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. (AR 83). Dr. Tulou determined that plaintiff had unlimited capacity to stoop, kneel, crouch, or crawl and that she had no manipulative or visual limitations. (AR 83). Dr. Tulou noted that plaintiff's hearing was limited and that her speaking abilities were unlimited, and he found that she should avoid even moderate exposure to hazards. (AR 83–84). Dr. Tulou

11

indicated that plaintiff demonstrated the capability for heavy or very heavy work, and he recommended a finding that she was not disabled.  (AR 85–86).

On December 20, 2018, plaintiff's claim for SSI was evaluated by a state agency physician at the initial level.  (AR 89–98).  Dr. Daniel Camden determined that plaintiff had the following severe medically determinable impairments: hearing loss and vestibular system disorders.  (AR 93).  Dr. Camden found that plaintiff's impairments were not limiting enough to prevent her from performing work and that her statements of severity were not supported by medical evidence in the file or plaintiff's ADLs, which were moderately limiting but not severe enough to prevent her from maintaining day-to-day functioning.  (AR 94).  Dr. Camden determined that plaintiff had no exertional, postural, manipulative, or visual limitations.  (AR 94).  Dr. Camden noted plaintiff's limited hearing and unlimited speaking ability, and he found that she should avoid even moderate exposure to noise and concentrated exposure to hazards.  (AR 94–95).  Dr. Camden concluded that plaintiff demonstrated a residual functional capacity ("RFC") with these communicative and environmental limitations, and he recommended a finding that plaintiff was not disabled.  (AR 95–97).

On April 16, 2019, plaintiff's claims for DIB and SSI were evaluated by a state agency physician at the reconsideration level.  (AR 101–18).  Dr. Richard Surrusco contacted plaintiff's representative and requested permission to contact plaintiff for updated information regarding an unaided hearing test.  (AR 105–06, 114–15).  Plaintiff's representative denied permission to contact plaintiff and did not provide the requested information, and Dr. Surrusco determined that there was insufficient evidence to make an assessment due to failure to cooperate.  (AR 106, 115).  Dr. Surrusco considered statements that plaintiff was unable to hear the telephone ringing without the speaker at high volume while using hearing aids and that she had absolute loss of

12

hearing without hearing aids.  (AR 105, 114).  Dr. Surrusco found that plaintiff's dizziness was a

non-severe impairment based on the overall evidence, including her lack of consistent treatment

specifically for dizziness and notes from her March 2019 appointment with Dr. Orfaly that

showed improvement.  (AR 106, 115).  Dr. Surrusco concurred with Dr. Camden's findings that

plaintiff's hearing loss and vestibular system disorders were severe medically determinable

impairments.  (AR 107, 116).  Dr. Surrusco determined that there was insufficient evidence to

evaluate plaintiff's claims, and he recommended a finding that plaintiff was not disabled.  (AR

107–08, 116–17).

### C.    The ALJ's Decision on March 25, 2021

The ALJ concluded that plaintiff was not disabled under sections 216(i), 223(d), and

1614(a)(3)(A) of the Social Security Act based on her applications for DIB and SSI for the

alleged onset period of November 6, 2017 through the date of the decision, March 25, 2021.

(AR 25).  When determining whether an individual is eligible for DIB and/or SSI, the ALJ is

required to follow a five-step sequential evaluation.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

It is this process that the court examines to determine whether the correct legal standards were

applied and whether the ALJ's final decision is supported by substantial evidence.  *See id.*

The ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful

employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the

impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se*

disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past

relevant work, whether the claimant can perform other work that exists in significant numbers in

the national economy.  *See id.*  The claimant bears the burden to prove disability for the first four

steps of the analysis.  *See McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983).  The

burden then shifts to the Commissioner at step five. *See id.* When considering a claim for DIB, the Commissioner must also determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

Here, the ALJ made the following findings of fact:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

(2) The claimant has not engaged in substantial gainful activity since November 6, 2017, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

(3) The claimant has the following severe impairments: sensorineural hearing loss and labyrinthine-vestibular function/vertigo (20 C.F.R. 404.1520(c) and 416.920(c)).

(4) The claimant does not have an impairment or combination of impairments that that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5) The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except the claimant can occasionally climb ramps and stairs and balance. The claimant can never climb ropes, ladders, and scaffolds. The claimant must avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights.

(6) The claimant is capable of performing past relevant work as a Cook Helper, Dictionary of Occupational Titles ("DOT") 317.687-10, Specific Vocational Preparation 2, medium exertion as defined in the DOT and as actually performed by the claimant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

(7) The claimant has not been under a disability, as defined in the Social Security Act, from November 6, 2017, through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

(AR 17–25).  In addition, the ALJ found other jobs in the national economy, such as bagger, that plaintiff could perform with her residual functional capacity.  (AR 24–25).  The Appeals Council declined to review the ALJ's decision finding no reason to do so under its rules.  (AR 1–3).

## IV. ANALYSIS

### A.    Overview

Plaintiff's motion for summary judgment raises two primary arguments.  First, plaintiff argues that the ALJ failed to evaluate Dr. Orfaly's opinions properly when determining plaintiff's RFC.  (Docket no. 16 at 6–12).  Specifically, plaintiff alleges that the ALJ did not sufficiently consider the supportability and consistency of Dr. Orfaly's opinions.  (Docket no. 16 at 6–12).  Second, plaintiff argues that the decisions by the ALJ and Appeals Council are constitutionally defective because they derive their authority from the Commissioner of the Social Security Administration whose appointment as a single head of the agency removeable only for-cause violates the separation of powers.  (Docket no. 16 as 12–17).  In response, the Commissioner argues that the ALJ properly considered Dr. Orfaly's medical opinion and that substantial evidence supports the ALJ's evaluation of plaintiff's RFC.  (Docket no. 19 at 11–18).  The Commissioner also argues that plaintiff's constitutional claim does not entitle her to a rehearing on separation of powers grounds because she was not actually harmed by the challenged removal provision.  (Docket no. 19 at 18–25).  Alternatively, the Commissioner argues that plaintiff's rehearing request should be denied under several other legal doctrines including harmless error, *de facto* officer, the rule of necessity, and broad prudential considerations.  (Docket no. 19 at 25–28).  For the reasons discussed below, the undersigned

recommends a finding that the ALJ's decision is supported by substantial evidence and that plaintiff is not entitled to a new hearing on separation of powers grounds.

**B.     The ALJ properly considered Dr. Orfaly's opinions and established an RFC that is supported by substantial evidence.**

The administrative record provides substantial evidence to support the ALJ's finding that plaintiff retained the RFC to perform medium work except that she could occasionally climb ramps and stairs and balance, could never climb ropes, ladders, and scaffolds, and that she needed to avoid concentrated exposure to hazards.  (AR 18–19).  Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Mastro*, 270 F.3d at 176 (quoting *Richardson*, 402 U.S. at 401).  If the ALJ's factual findings are supported by substantial evidence, the district court should affirm the final decision of the Commissioner. *Mascio*, 780 F.3d at 634.

Plaintiff alleges that the ALJ's RFC analysis was deficient because the ALJ improperly evaluated the opinions provided by Dr. Orfaly, plaintiff's treating ear, nose, and throat specialist ("ENT").  (Docket no. 16 at 6–12).  Specifically, plaintiff claims that the ALJ "attempt[ed] to address the mandatory factors of consistency and supportability" when evaluating Dr. Orfaly's opinions but did not "accurately represent the record."  (Docket no. 16 at 7).  As a result, plaintiff alleges that the RFC "does not include a majority of the opinions provided by Dr. Orfaly." (Docket no. 16 at 6).  As plaintiff notes, the applicable regulations establish that an ALJ will consider the supportability and consistency of medical opinion evidence when evaluating its persuasiveness in a claim for disability benefits.  *See* 20 C.F.R. 404.1520c(b)(2).  A medical opinion is persuasive to the extent that it is: (1) supported by objective medical evidence and explanations presented by the medical source itself, and (2) consistent with evidence from other medical and non-medical sources.  *See* 20 C.F.R. 404.1520c(c)(1), (2).  An ALJ evaluating

16

medical opinion evidence must explain in sufficient detail how such evidence is considered and how it affects the ALJ's ultimate conclusions regarding disability. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (noting that an ALJ's opinion "should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence"). Contrary to plaintiff's argument otherwise, the ALJ thoroughly considered the supportability and consistency of Dr. Orfaly's opinions when finding that they were not persuasive.

### i. Supportability of Dr. Orfaly's Opinions

The ALJ adequately evaluated the supportability of Dr. Orfaly's opinions when developing plaintiff's RFC. Plaintiff argues that the ALJ merely claimed that they were unsupported and failed to examine the evidence and supporting explanations that Dr. Orfaly provided. (Docket no. 16 at 8). Plaintiff cites to evidence that she argues tends to support the findings in Dr. Orfaly's medical source statement, including that Dr. Orfaly treated plaintiff for over a year and a half before presenting his opinions, that Dr. Orfaly diagnosed plaintiff with severe bilateral hearing loss and chronic dizziness, and that these diagnoses were supported by clinical testing including an audiogram and balance test. (Docket no. 16 at 8). Plaintiff notes that Dr. Orfaly found that her condition was unlikely to improve and that her chronic dizziness and balance issues required that she lie down periodically and avoid sitting or standing for long periods. (Docket no. 16 at 8–9). Plaintiff claims that these findings are further supported by Dr. Orfaly's treatment notes and his November 12, 2018 letter. (Docket no. 16 at 9).

The ALJ reasonably determined that Dr. Orfaly's opinions were unsupported by the evidence on which he relied. In his medical source statement, Dr. Orfaly found that plaintiff had extensive exertional and postural limitations, including an inability to sit, stand, or walk for two

17

or more hours,[3] an inability to carry greater than five pounds frequently or greater than ten

pounds occasionally, and an inability to stoop, bend, squat, kneel, or turn her head more than

occasionally.  (AR 432–34).  Finding this assessment unpersuasive, the ALJ observed that Dr.

Orfaly's treatment records noted consistently normal neurological findings and lacked any

musculoskeletal testing to support the exertional and postural limitations that he proposed.  (AR

22).  Plaintiff argues that the ALJ's observation of the lack of musculoskeletal testing reveals a

"fundamental misunderstanding" of plaintiff's severe impairments, which relate to dizziness and

balance issues and not to musculoskeletal impairments.  (Docket no. 16 at 9–10).  Plaintiff's

argument is misguided, however, because the ALJ adequately considered plaintiff's alleged

dizziness when determining her RFC.  Reviewing Dr. Orfaly's treatment notes, the ALJ observed

that plaintiff's dizziness was intermittent, improving, and appeared stable.  (AR 21).  Although

there were undoubtedly periods during which plaintiff's dizziness and vertigo worsened,[4] Dr.

Orfaly's treatment notes reflected that plaintiff's dizziness began improving in early 2019 and

had resolved by July 2019.[5]  (AR 419, 425, 428–29).  Plaintiff does not attempt to explain how

her intermittent dizziness supports the extensive exertional and postural limitations that Dr.

Orfaly proposed, and the ALJ did not err in finding these limitations unsupported by Dr. Orfaly's

own treatment notes.

 The ALJ also reasonably rejected Dr. Orfaly's proposed manipulative limitations.  Dr.

Orfaly found detailed manipulative limitations, including that plaintiff could reach, handle,

---

[3] In the same medical source statement, Dr. Orfaly estimated that plaintiff could sit for two to three hours.  (AR 433).

[4] At her January 7, 2020 appointment, plaintiff reported two dizzy episodes the prior day while sitting down, which lasted five minutes, and she stated that her dizziness restricted her from doing normal activities.  (AR 422–23).

[5] Notably, Dr. Orfaly's November 12, 2018 letter in support of plaintiff's disability claim did not mention plaintiff's reported dizziness and vertigo.  (AR 409).

finger, feel, and push or pull controls frequently (33–67% of an eight-hour workday).  (AR 434).
The ALJ found these proposed manipulative limitations unsupported by evidence that plaintiff
demonstrated consistently normal range of motion, gait, and station, and that motor and sensory
findings were intact.  (AR 23).  Even assuming that plaintiff's intermittent dizziness impacted
her manipulative capacity to some extent, the ALJ reasonably found that Dr. Orfaly's proposed
manipulative limitations were unsupported by the evidence in the record on which he relied.

Dr. Orfaly's predictions about plaintiff's communicative limitations are likewise
unsupported by his own treatment records.  In his November 12, 2018 letter, Dr. Orfaly indicated
that plaintiff was unable to communicate or perform her job duties at that time, especially
without hearing aids.  (AR 409).  This finding is directly contradicted by Dr. Orfaly's own
treatment notes from plaintiff's appointment a week earlier, where he noted plaintiff's "normal
ability to communicate" and her ability to engage in conversational speech without
misunderstanding words.  (AR 410–11).  In his medical source statement, Dr. Orfaly stated that
plaintiff had very poor hearing even when using hearing aids.  (AR 435).  This statement is again
contradicted by Dr. Orfaly's consistent findings that plaintiff demonstrated a normal ability to
communicate and to engage in conversational speech at each of her ENT appointments between
2018 and 2020.  (AR 391, 401, 410–11, 419–20, 422–23, 425–26, 428–29).  Dr. Orfaly's
treatment notes further establish that plaintiff's hearing loss was improved with new hearing
aids.  (AR 411).  These are glaring contradictions that provide sufficient support for the ALJ's
determination that Dr. Orfaly's proposed communicative limitations were unsupported by the
evidence that he considered (AR 23).

*ii. Consistency of Dr. Orfaly's Opinions*

The ALJ also reasonably determined that Dr. Orfaly's opinions were inconsistent with other relevant evidence in the record. Plaintiff argues that the ALJ improperly relied on Dr. Tulou's opinion when determining that Dr. Orfaly's opinions were inconsistent with the record. (Docket no. 16 at 10–12). Plaintiff also argues that the ALJ failed to consider other evidence in the record when determining the consistency of Dr. Orfaly's opinions. (Docket no. 16 at 10–12). Plaintiffs arguments here mischaracterize the extent to which the ALJ considered relevant medical and non-medical evidence while evaluating the consistency of Dr. Orfaly's opinions.

The ALJ reasonably relied on Dr. Tulou's opinion when considering the consistency of Dr. Orfaly's opinions with other relevant records. When considering Dr. Orfaly's prediction that plaintiff would be absent from work more than three times per month, that she would need additional rest periods, and that she would be unable to tolerate even low-stress jobs, the ALJ found that this opinion conflicted with Dr. Tulou's conclusions. (23, 433–35). As noted above, Dr. Tulou determined that plaintiff retained the RFC for heavy or very heavy work, but that she could frequently balance, occasionally climb ramps and stairs, and never climb ladders, ramps, or scaffolds. (AR 83–85). Dr. Tulou found that plaintiff's hearing was limited and that she needed to avoid even moderate exposure to hazards. (AR 83–84). The ALJ found Dr. Tulou's proposed postural and environmental limitations partly persuasive but determined that plaintiff's combination of conditions warranted additional limitations. (AR 22). Plaintiff argues that the ALJ's reliance on Dr. Tulou's opinion was improper because it was provided in October 2018, only five months after Dr. Orfaly began treating plaintiff and before he issued his November 2018 letter and January 2020 medical source statement. (Docket no. 16 at 10). This is not a circumstance, however, in which the ALJ completely disregarded Dr. Orfaly's relevant findings

20

in favor of Dr. Tulou's determination. To the contrary, the ALJ explicitly considered Dr. Orfaly's findings regarding plaintiff's ability to communicate effectively and her hearing improvement while evaluating the persuasiveness of Dr. Tulou's opinion. (AR 22). The ALJ further noted that Dr. Tulou's findings were based on plaintiff's May 2018 diagnostic testing values and ultimately adopted a more restrictive RFC. (AR 22). After considering the full evidence in the record, the ALJ determined that plaintiff's combination of conditions warranted additional limitations beyond those proposed by Dr. Tulou, including that plaintiff retained the RFC for medium work except that she could occasionally climb ramps and stairs and balance, that she could never climb ropes, ladders, and scaffolds, and that she needed to avoid concentrated exposure to hazards. (AR 18–19, 22).

Plaintiff argues that the ALJ's reliance on Dr. Tulou's opinion is inconsistent with that of the state agency physician at the reconsideration level. (Docket no. 16 at 10–11). As plaintiff correctly notes, Dr. Surrusco found on April 16, 2019 that there was insufficient evidence to determine plaintiff's RFC. (AR 107–08, 116–17). Plaintiff ignores the fact that Dr. Surrusco's finding of insufficient evidence was based on plaintiff's failure to cooperate after her representative refused to allow Dr. Surrusco to contact plaintiff for an updated hearing test and failed to provide the requested information. (AR 105–06, 114–15). Notably, Dr. Surrusco concluded that plaintiff's dizziness—which she argues underlies Dr. Orfaly's proposed functional limitations—was a non-severe impairment based on the overall evidence, including plaintiff's lack of consistent treatment specifically for dizziness and notes from her March 2019 appointment with Dr. Orfaly that showed improvement. (AR 106, 115).

The ALJ also considered other evidence in the record when determining the consistency of Dr. Orfaly's opinions. Plaintiff's suggestion that the ALJ relied solely on Dr. Tulou's opinion

21

to discredit Dr. Orfaly's findings is inaccurate.  When evaluating the consistency of Dr. Orfaly's opinions, the ALJ also considered plaintiff's testimony at the disability hearing and evidence from other medical care providers.  (AR 23).  The ALJ noted that plaintiff was able to testify effectively during the hearing using an interpreter and that she appeared able to understand, provide responses to questions, and participate meaningfully.  (AR 20, 23).  The ALJ found this inconsistent with Dr. Orfaly's finding that plaintiff was unable to communicate.  (AR 23).  The ALJ further found that records from other medical providers were inconsistent with Dr. Orfaly's finding that plaintiff was limited to sedentary work, which the ALJ found to be based on plaintiff's subjective allegations.  (AR 23).  The ALJ noted that plaintiff suffered a fall on November 6, 2017, which resulted in a left periorbital contusion, but imaging showed no intracranial abnormality.  (AR 20).  The ALJ further noted that plaintiff demonstrated normal range of motion and that subsequent EEG and BAER testing was normal.  (AR 21).  The ALJ considered records that plaintiff demonstrated normal musculoskeletal and sensory function and that she was neurologically cleared to return to work.  (AR 21).  Considering the ALJ's RFC analysis as a whole, it is apparent that he properly considered the medical and non-medical evidence in the record when evaluating the consistency of Dr. Orfaly's opinions.

    **C.**    **Plaintiff is not entitled to a new hearing because she has not established any harm traceable to the purportedly unconstitutional removal statute.**

    The findings of the ALJ and Appeals Council should be affirmed because plaintiff is unable to prove that she was harmed by the statute governing removal of the SSA Commissioner. Plaintiff argues that the appointment of Andrew Saul as Commissioner of the SSA violated separation of powers principles because he was appointed as the single head of an agency and removeable only for-cause.  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *see also* 42 U.S.C. § 902(a)(3) ("An individual serving in the office of Commissioner

22

may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."). Because ALJs and members of the Appeals Council derive their authority from the Commissioner, plaintiff argues that she is entitled to a remand and new hearing before an ALJ with appropriate constitutional authority. (Docket no. 16 at 12–17). The Commissioner concedes that the challenged statutory scheme is unconstitutional,[6] but she argues that plaintiff is not entitled to a remand because she has failed to demonstrate that the removal restriction caused the denial of her claim. (Docket no. 19 at 21–25). Alternatively, the Commissioner argues that there was no constitutional violation here because the ALJ was ratified by an Acting Commissioner subject to removal at-will and that plaintiff's rehearing request should be denied under various legal doctrines including harmless error, *de facto* officer, rule of necessity, and broad prudential considerations. (Docket no. 19 at 20–21, 25–28). The undersigned finds no need to address these issues because plaintiff is not entitled to a remand due to a lack of compensable harm.

Plaintiff is not entitled to a remand because she has not established that she suffered from a cognizable harm arising out of the challenged removal statute. The parties agree that for-cause removal restrictions on the Commissioner violate the separation of powers, but this is not the end of the analysis. In *Collins v. Yellen*, Fannie Mae and Freddie Mac shareholders brought suit alleging that the statute that created the Federal Housing Finance Agency (FHFA) violated the separation of powers because it created an independent agency headed by a single director

---

[6] In July 2021, the Office of Legal Counsel issued a memorandum opinion finding that the statutory restriction on at-will removal of the Commissioner violates the separation of powers. *See* Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OLC Memo"). This conclusion seems compelled by the Supreme Court's rulings in *Seila Law* and *Collins v. Yellen*, 141 S. Ct. 1761 (2021).

subject only to removal by the President for-cause. *See* 141 S. Ct. at 1770. The *Collins* plaintiffs sought return of all dividend payments that had been made to the Treasury by Fannie Mae and Freddie Mac while FHFA directors were subject to the unconstitutional removal scheme. *See id.* The Supreme Court agreed with the plaintiffs that the removal structure violated the separation of powers. *See id.* at 1783. Citing to its opinion in *Seila Law*, the Court reiterated that Congress cannot limit removal of a single head of an independent agency for-cause. *See id.* at 1783–84. However, the Court declined to grant plaintiffs their requested remedy. *See id.* at 1788–89. The Court noted that each of the officers heading the FHFA during the disputed period were properly appointed and that there was no constitutional defect in their appointment. *See id.* at 1787. The Court found it necessary to remand for a determination of whether the plaintiffs suffered actual harm due to the unconstitutional removal provision. *See id.* at 1788–89.

Here, as in *Collins*, plaintiff challenges an action adopted by a properly appointed government official.[7] Plaintiff argues that the Commissioner had "no lawful authority to appoint the ALJ or promulgate regulations" and that the ALJ had "no lawful authority to hear or decide the case," (Docket no. 16 at 17), but she offers no support for these propositions beyond a conclusory argument that the challenged removal statute somehow taints the overall authority of the Commissioner. Moreover, plaintiff expressly concedes in her reply brief that her appeal does not raise an Appointments Clause challenge. (Docket no. 22 at 2). As the *Collins* Court recognized, there is a distinction between the exercise of authority that an official does not possess and the exercise of proper constitutional authority while subject to unlawful removal

---

[7] Plaintiff does not allege defects in the appointment of Andrew Saul as Commissioner of the SSA or in the appointment of the ALJ or members of the Appeals Council. Nor does plaintiff allege that the Commissioner may not delegate authority to an ALJ or to the Appeals Council. In fact, plaintiff acknowledges that the Commissioner is authorized to delegate authority to hear and decide social security cases to an ALJ. (Docket no. 16 at 13).

conditions. *See Collins*, 141 S. Ct. at 1787–89. The former is presumptively void while the latter requires a showing of actual and causal harm. *See id.* Here, there is no indication that the Commissioner—or the ALJ or Appeals Council members exercising their authority on the Commissioner's behalf—were appointed in violation of the Appointments Clause or that they exceeded the scope of their authority.

With this understanding, plaintiff must demonstrate that the unconstitutional removal provision directly caused her harm to entitle her to the relief that she seeks. *See id.* at 1788–89. That an action was taken by a government official subject to unlawful removal provisions is insufficient alone to warrant invalidation of the action. *See id.* at 1788 n.23 ("Settled precedent . . . confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office."). The *Collins* Court observed in dicta that an unconstitutional removal provision is automatically displaced by the Constitution but that there may be circumstances in which it nevertheless causes compensable harm. *See id.* at 1788–89. For example, harm could be established if the President was prevented from removing an officer by a court order requiring "cause" for removal or if the President publicly indicated a desire to remove an officer but was unable to do so due to the removal statute. *See id.* at 1789.

Here, plaintiff is unable to establish actual harm. There is no evidence that either a court order requiring "cause" for removal or the removal provision itself prevented the President from removing the Commissioner prior to the decisions of the ALJ and Appeals Council. *See id.* Plaintiff indicates in her reply brief that she is not "pursu[ing] the ALJ issue any further because the ALJ issued his decision while former President Trump was still in office." (Docket no. 22 at 3). Plaintiff instead argues that she was harmed by the denial of a "constitutionally valid adjudication" and "constitutionally valid determination" of her claim by the Appeals Council.

25

(Docket no. 22 at 3).  As an initial matter, plaintiff's reply brief appears to misstate the timing of the ALJ and Appeals Council decisions.  The ALJ issued his decision on March 25, 2021, more than two months after the inauguration of President Biden.  The Appeals Council's decision denying plaintiff's request for review was issued on September 2, 2021, nearly two months after Andrew Saul's termination as Commissioner and during Kilolo Kijakazi's tenure as Acting Commissioner of the SSA.  Plaintiff does not argue that the Acting Commissioner is subject to the same allegedly unconstitutional removal provision, so it is not immediately apparent how the Appeals Council's decision is relevant to plaintiff's harm argument.

Even assuming that the ALJ's decision is the relevant act that plaintiff intended to challenge, she has failed to establish that Commissioner Saul would have been removed but for the allegedly unconstitutional removal provision.  Plaintiff argues that it is "unmistakably clear that President Biden wished to terminate Commissioner Saul immediately upon assuming the Presidency," but that he was prevented from doing so by the removal statute.  (Docket no. 22 at 4).  Plaintiff refers to two pieces of evidence to support her claim—the OLC Memo and the White House's official statement on Commissioner Saul's removal—both of which are dated several months after the ALJ's decision.  (Docket no. 22 at 4–5); *see* Nicole Ogrysko, *Biden Fires Saul as SSA Commissioner*, Fed. News Network (July 9, 2021, 5:28 PM), https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner/.  Plaintiff concedes that the OLC Memo does not alone establish that the statute prevented the President from removing Commissioner Saul but argues that this position is confirmed by the White House statement.  (Docket no. 22 at 4).  This argument is unavailing as the statement by an unnamed White House official neither references the removal statute at issue nor indicates that the

President intended to remove Commissioner Saul as of the date of the ALJ's decision.  *See* Ogrysko, *supra*.

Importantly, plaintiff offers no evidence that an ALJ or Appeals Council acting under the authority of a Commissioner removeable at-will would have come to a different conclusion regarding her claim or that there were any procedural deficiencies in her case.  Although the ALJ's decision was rendered while Commissioner Saul was in office, the denial of plaintiff's disability claim was affirmed by an Appeals Council acting pursuant to the authority of the Acting Commissioner of the SSA.  *See* 42 U.S.C. § 902.  The Acting Commissioner, as a party to this litigation, has continuously held the position that the decision was proper and should be affirmed.  (Docket no. 19 at 28).  As noted above, the ALJ's decision was supported by substantial evidence, and plaintiff does not allege that the ALJ committed any legal error warranting a remand.  Simply put, plaintiff has not shown that a remand would feasibly result in a different decision by the ALJ, the Appeals Council, or, by extension, the Commissioner. Significantly, other courts in this circuit have rejected similar claims alleging purely speculative harm arising out of the challenged removal provision.  *See Helms v. Comm'r of Soc. Sec.*, No. 3:20-cv-589-MOC, 2021 WL 5710096, at *2–3 (W.D.N.C. Dec. 1, 2021); *Pepper v. Kijakazi*, No. 6:20-cv-4159-CMC, 2022 WL 391577, at *3 (D.S.C. Feb. 9, 2022).  Because plaintiff has failed to make any connection between the unconstitutional removal provision, as applicable to the Commissioner, and the factual findings of the ALJ, undisturbed by the Appeals Council, a remand is improper.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the Commissioner's final decision denying benefits for the period of November 6, 2017 through the date of the ALJ's decision on

March 25, 2021 be affirmed.  Accordingly, it is recommended that plaintiff's motion for summary judgment (Docket no. 15) be denied, and the Commissioner's motion for summary judgment (Docket no. 18) be granted.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 25th day of May, 2022.

/s/
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

28